# DUVAL & STACHENFELD LLP

555 MADISON AVENUE, SIXTH FLOOR
NEW YORK, NEW YORK 10022

TELEPHONE: 212-883-1700
FACSIMILE: 212-883-8883

TIMOTHY J. PASTORE
DIRECT DIAL: 212-692-5982
tpastore@dsllp.com

August 20, 2014

**VIA ECF & MESSENGER**

Honorable Naomi Reice Buchwald
United States Courthouse
500 Pearl Street
New York, New York 10007-1312

> Re:  **Wells Fargo Bank N.A. v. Sovereign Bank, N.A.**
> **Case No. 13-CV-1222 (NRB) (the "Enco Action")**
> **Case No. 13-CV-4313 (NRB) (the "Five Loan Action")**

Dear Judge Buchwald:

Together with Snyder Law Firm LLC, we represent Plaintiff in the above-referenced Enco Action and Five Loan Action (collectively, the "Actions").

On August 14, 2014, Your Honor held oral argument on a series of motions now pending in both Actions. In connection with the pending motions, Defendant has argued, *inter alia*, that the additional claims asserted by Plaintiff in the Actions should be dismissed based on the failure of Plaintiff to provide a supplemental written notice of breach and an opportunity for Defendant to repurchase the very same commercial loans that Defendant already refused to repurchase following its receipt of Plaintiff's original notices of breach, dated February 9, 2012, and March 19, 2013, respectively.

While Plaintiff respectfully disagrees that sending a notice of breach (let alone a supplemental notice) is a condition precedent to pursuing additional claims in the Actions, and notes that all such additional claims have already been fully described in the Actions, Plaintiff today sent the attached formal supplemental notice of breach concerning the additional claims.

As set forth expressly therein, the supplemental notice was sent subject to, and without waiver of, Plaintiff's position that the sending of such notice is not is a condition precedent to enforcing Defendant's repurchase obligation through litigation. Further, in accordance with Section 2.03(b) of the applicable Pooling and Servicing Agreement, "… no delay in either the discovery of a Defect or Breach or delay on the part of any party to this Agreement in providing notice of such Defect or Breach shall relieve the Mortgage Loan Seller [Defendant] of its obligation to repurchase…."

Plaintiff respectfully requests that the supplemental notice be included in the record, together with the other papers submitted in connection with the pending motions.

Respectfully submitted,

Timothy J. Pastore

Enclosures

cc:   Paul D. Snyder, Esq. (by e-mail)
      Robert J. Malatak, Esq. (by e-mail)

# Exhibit A



Waterstone Asset Management, LLC
8720 Red Oak Boulevard
Suite 300
Charlotte, NC 28217

704.926.6501 Tel
866.848.5604 Fax

August 20, 2014

**VIA UPS EXPRESS**

The Parties Listed on
Schedule A Attached hereto

****NOTICE UNDER PSA SECTION 2.03(b) AND MLPA SECTION 6****

      Re:     **Supplemental Notice of Breaches with respect to certain Loans Securitized by Sovereign Bank, N.A. ("Sovereign" or the "Mortgage Loan Seller") into Sovereign Commercial Mortgage Securities Trust, 2007-Cl, Commercial Mortgage Pass-Through Certificates, Series 2007-Cl ("2007-C1" or the "Trust")**

Ladies and Gentlemen:

Reference is made to the 2007-C1 Pooling and Servicing Agreement dated June 1, 2007 ("PSA") and to the related Mortgage Loan Purchase Agreement ("MLPA"). All capitalized terms not specifically defined herein have the meaning ascribed to them in the PSA.

Section 2.03(b) of the PSA provides that if a party to the PSA discovers or receives notice of a Breach with respect to the Representations and Warranties of the MLPA, which Breach materially and adversely affects the value of such Mortgage Loan, the related Mortgaged Property or the interests of the Trustee or any Certificateholder in the Mortgage Loan or the related Mortgaged Property, such party shall give prompt written notice of such Breach (the "Notice") to the other parties identified in Section 2.03(b) of the PSA. Upon becoming aware of any Breach, the discovering party shall request in writing that the Mortgage Loan Seller, not less than ninety (90) days from such Mortgage Loan Seller's receipt of the Notice, cure the Breach, as the case may be, in all material respects, or repurchase the affected Mortgage Loan or REO Loan from the Trust at the applicable Purchase Price and in conformity with the MLPA and the PSA.

Waterstone Asset Management ("Waterstone") is the sub-special servicer for the Trust. On February 9, 2012, Waterstone served a notice of Breach as to the Enco Loan, which referenced and described Breaches of Representation and Warranty No. 18. On March 19. 2013, Waterstone served a notice of Breach as to the remaining four loans, which referenced and described Breaches of Representation and Warranty Nos. 10 and 18.[1] The five loans at issue are referenced collectively herein as "the Loans." Following receipt of the referenced notices, Sovereign Bank, N.A. ("Sovereign"), as the Mortgage Loan Seller, failed to repurchase any of the Loans within 90 days

---

[1]     While this notice of Breach also originally referenced the Magnolia Terrace Loan (Loan Number 577205326), that loan subsequently paid off as agreed, and Waterstone has informed Sovereign it is no longer seeking repurchase as to that loan.

of receiving the notices. As a result, litigation was commenced on behalf of the Trust seeking repurchase of the Loans. The lawsuit regarding the Enco Loan is currently pending as *Wells Fargo Bank, N.A. v. Sovereign Bank, N.A.*, Case No. 13 cv 01222 (S.D.N.Y.). The lawsuit regarding the remaining four loans is currently pending as *Wells Fargo Bank, N.A. v. Sovereign Bank, N.A.*, Case No. 13 cv 4313 (S.D.N.Y.). The two pending repurchase lawsuits are collectively referenced herein as "the Repurchase Litigation."

The Trust has sought in the Repurchase Litigation to assert additional claims of Breach related to both those Representations and Warranties that were referenced in the original notices, as well as other Representations and Warranties. The Trust has taken the position in the Repurchase Litigation that service of supplemental notices of Breach was not a condition precedent to asserting the additional claims in the Repurchase Litigation because: 1) under relevant case law, Section 2.03(b) of the PSA, referenced above, does not constitute a condition precedent; 2) Section 2.03(b) itself specifically provides: "Notwithstanding anything contained in this Agreement or the Mortgage Loan Purchase Agreement, no delay in either the discovery of a Defect or Breach or delay on the part of any party to this Agreement in providing notice of such Defect or Breach shall relieve the Mortgage Loan Seller of its obligation to repurchase…." (emphasis supplied); and 3) given the pendency of the Repurchase Litigation, the fact that written notice of Breach had already been provided, the fact that Sovereign had already refused to repurchase the Loans, and the fact that cure was not possible under the circumstances, there is no basis under the Federal Rules of Civil Procedure or local court rules to postpone the Repurchase Litigation for 90 days every time the Trust seeks leave to amend its claims.

Therefore, while Waterstone and the Trust specifically deny that service of a supplemental notice of Breach is a condition precedent to pursuing additional claims in litigation, and notes that all such additional claims have already been fully described in the Repurchase Litigation (well more than 90 days ago), and while Waterstone reserves all rights, Waterstone hereby provides formal written notice of the additional Breaches in light of arguments raised in the Repurchase Litigation.

As a result of facts outlined in this letter, Waterstone is formally giving the parties hereto notice of Breaches of Representations and Warranties with material and adverse effect and is further notifying the Mortgage Loan Seller of its obligation to cure or repurchase all applicable loans within 90 days of receipt of this letter.

This notice is not presented as an all-inclusive list of Breaches in the Loans. There may be breaches in addition to those detailed herein and Waterstone reserves the right to assert such additional Breaches in the future as Waterstone becomes aware of them.

## THE SOVEREIGN LOAN PROGRAM-SYSTEMIC FLAWS

The loan program under which the Loans were originated was systemically flawed such that the origination and servicing of the Loans was not proper and prudent, and did not meet customary industry standards in a number of different respects. As a result, the Loans breached Representation and Warranty 10, which states that "[t]he origination, servicing and collection

practices used by Seller … with respect to such Mortgage Loan have been in all material respects legal, proper and prudent and have met customary industry standards."

For example, the mortgage broker for the Loans, Meridian Capital ("Meridian"), was a subsidiary of Independence Community Bank ("Independence Bank"), to which Sovereign is successor by merger. Meridian, in discussing several of the Loans, referred to the borrower as "my client" and advocated on behalf of the borrower for the lender bank to provide more borrower-favorable loan terms. This improper arrangement, which included Meridian's receipt of significant brokerage fees if the Loans were made, created a conflict of interest, was an imprudent practice and violated customary industry standards.

In addition, while Sovereign used a standard mortgage document requiring that the borrower pay a monthly amount equal to 1/12 of annual estimated property taxes, sewer and water taxes, and property and casualty insurance premiums, this provision was removed via exhibits modifying the mortgage terms in one or more of the Loans. This practice was a departure from customary industry origination and servicing practices.

Similarly, while the appraisals that were conducted in support of the Loans employed an income approach to value and deducted an annual reserve for repairs, the standard note and mortgage utilized by Sovereign did not require the borrowers to make monthly payments of reserves for repairs and maintenance, which was a departure from customary industry origination and servicing practices.

In addition, Sovereign's interim servicing of the Loans (which, for each Loan, spanned from the date the Loan was originated to when it was securitized) failed to satisfy customary industry standards because Sovereign as an interim servicer did little if anything to service the Loans during this period of time. Specifically, upon information and belief, Sovereign oftentimes did not engage in basic servicing functions such as: conducting site inspections, collecting and analyzing property operating statements, and ordering appraisal updates during the interim servicing periods. Given that the interim servicing period for each of the Loans was a relatively lengthy period of time, lasting anywhere from six months to three and a half years, these servicing failures adversely impacted the Loans prior to securitization. For these reasons, and others, Sovereign's servicing of the Loans failed to satisfy customary industry standards for servicing.

In addition to the systemic flaws just described, as well as the Breaches that were described in the original notices of Breach, each of the Loans also suffered from numerous loan-specific flaws, which are described in detail below.

## THE ENCO LOAN

1. In the lead recitals paragraph of the Guarantee Agreement, executed by the Borrower principals on October 3, 2006, Sovereign required the Borrower principals "in order to induce Sovereign Bank … to make a first mortgage loan in the amount of … $1,330,000 … and a second mortgage loan in the amount of … $170,000 … (collectively, the 'Loan')" to enter into an agreement fully guaranteeing the entire amount of the "Loan" as long as

the "Loan" was outstanding. In doing so, Sovereign treated the Enco Loan and the Second Loan as "the Loan" for purposes of accessing the personal assets of the principals upon the default of either loan, a practice and requirement that exposed the Trust's loan and its Guarantors to risks arising from a loan not assigned to the Trust and to actions taken by a noteholder separate from and beyond the control of the Trust, an arrangement not in accordance with customary industry standards.

2. In making the Enco Loan, Sovereign did not require that the principals of the anticipated borrower establish a Single Purpose Entity ("SPE") to serve as the borrower. In fact, the Borrower on the Trust's loan, Enco Investment Corp., owned two other commercial real estate properties in two other cities, which properties were encumbered by two other mortgages, with two other loans not assigned to the Trust, for which the debt service on each was similar in magnitude to the debt service on the Trust's loan and the debt service coverage ratio on one of which was significantly less than 1.0. The origination of a CMBS loan to an entity that is not a SPE violates customary industry standards for multiple reasons, including but not limited to the fact that there is an increased risk in making a loan to a borrower with businesses and liabilities beyond those related to the loan and mortgaged property at issue.

3. While the Enco Loan was underwritten using a deduction of reserves for repairs in calculating underwritten cash flow, the Security Instrument did not require a monthly escrow for such repairs, a violation of customary industry standards.

## THE LINDEN LOAN

1. Due to the undisclosed Second Linden Loan (as described in the original notice of Breach), the true loan-to-value ("LTV") ratio at origination was 82%, which was too risky given this type of loan. The true debt service coverage ratio ("DSCR") was correspondingly made riskier as well.

2. Net cash flow debt service coverage ratio ("NCF DSCR") was reported by Sovereign as 1.31. Actual NCF DSCR for the calendar year 2007 was 1.14, based on the tax return filed by the borrower for that year. The underwriting at origination, therefore, is suspect based on the significant discrepancy between actual and underwritten numbers.

3. The June 19, 2006 approval letter issued for the Linden Loan required a $57,500 escrow account to be funded by the borrower at closing, in order to provide funds to cover the estimated $45,000 in deferred maintenance and repairs items. At the request of Meridian, the broker subsidiary of Independence Bank, this requirement was removed in a June 28, 2006 letter to the bank.

4. Similarly, the June 19, 2006 approval letter required that the borrower open an account with Independence Bank and deposit all lease security deposits received from the lessees. This provision was also waived at the request of Meridian in its June 28, 2006 letter to the bank.

5. Exhibit B to the Mortgage for the Linden Loan removed the requirement of Section 7 of the Mortgage requiring monthly escrow of sewer and water, taxes and insurance premiums.

## THE CAROLINE ARMS LOAN

1. Due to the undisclosed Second Caroline Arms Loan (as described in the original notice of Breach), the true LTV ratio at origination was 84%, which was too risky given this type of loan. The true DSCR was correspondingly made riskier as well.

2. For the calendar year 2007, cash flows for the Mortgaged Property were significantly lower from the net operating income ("NOI") and net cash flow ("NCF") amounts that were reflected in the underwriting files for the Caroline Arms Loan, suggesting a flaw in the origination of the loan. Due to the systemic failure by Sovereign to interim service the Loans, there are no property operating statements in the file post-origination that could provide an explanation for these discrepancies.

3. Section 17 of the Caroline Security Instrument for the Caroline Arms Loan (Preservation, Management, and Maintenance of Mortgaged Property) required the Borrower to not commit waste or permit deterioration of the Mortgaged Property, and to keep it in good repair. The first site inspection report following loan origination, conducted on May 27, 2008, identified items of deferred maintenance that were not identified in the original appraisal report at the time of loan origination, specifically, "[t]he parking lot is cracked. The landscaping has bare areas. The curbing around the signage is damaged. There are four units down for repairs." Due to the existence of these conditions on the Closing Date, the borrower was in default under the Caroline Security Instrument.

## THE GRAND LOAN

1. Due to the undisclosed Subordinate Grand Loan (as described in the original notice of Breach), the true LTV ratio at origination was 102%, which was too risky given this type of loan. The true DSCR was correspondingly made riskier as well.

2. The borrower submitted a lease certification as part of Sovereign's underwriting of the Grand Loan, asserting that base rents in place were $236,000. Without any explanation, the appraiser utilized $251,120 in rents (with $0 vacancy allowance). In addition, the borrower's tax return for the first tax year after loan origination (which included seven months prior to loan origination) reported rental income of only $174,985 and a NOI of only $94,995, compared to NOI of $171,100 used by the appraiser at time of underwriting, implying an actual DSCR in the first year of 0.78, before taking into account the debt service obligation of the Second Grand Loan.

3. The Grand Mortgage, at Paragraph 38, required that a money market account be maintained (in an unspecified amount) or guaranteed, as long as the Grand Loan was outstanding. There is no evidence such an account was ever opened, and no such account was ever

transferred or pledged to the Trust.

4. The loan approval for the Grand Loan, dated September 9, 2004, required that the Mortgaged Property be free and clear of all violations at loan closing. In addition, the Grand Mortgage, at Paragraph 40, required that all building, housing, and fire code violations reported in an abstract dated August 1, 2004, be dismissed and notices delivered prior to June 5, 2005. There was no escrow held back on the violations as required by the Grand Mortgage, and no evidence in the file that the dismissal notices were delivered.

## THE MARINA PALMS LOAN

1. Borrower Marina Palms 299, LLC ("Marina Palms") executed a Consolidated, Amended and Restated Multifamily Note dated as of December 12, 2006 (the "Marina Palms Note") in the original principal amount of $17,480,000 in favor of Independence Bank.

2. The Marina Palms Loan was the fourth largest loan in a pool of more than 260 loans that were securitized into the Trust. Therefore, Sovereign's employees who worked on the origination of this loan had incentive to be particularly careful and conservative.

3. In February 2006, prior to the origination of the Marina Palms Loan, the Mortgaged Property was acquired by MPI Marina Palms LLC for $20,500,000.

4. An appraisal dated October 2, 2006 that was prepared for purposes of underwriting the Marina Palms Loan, acknowledged the earlier $20,500,000 sale, but valued the Mortgaged Property at $22,000,000, citing "capital improvements, more efficient management, and improved market conditions," without providing additional commentary or detail. The appraiser reported the Mortgaged Property to be in "average" condition in all categories.

5. On December 12, 2006, MPI Marina Palms LLC sold the Mortgaged Property to Marina Palms for $22,000,000.

6. Marina Palms' obligations under the terms of the Marina Palms Loan are secured by, among other things, a Consolidated, Amended and Restated Multifamily Mortgage, Assignment of Rents and Security Agreement dated as of December 12, 2006 (the "Marina Palms Security Instrument") on Mortgaged Property located at 6904 Manatee Avenue W, Bradenton, Florida, 34209 known as the Marina Palms Apartments. In addition, Marina Palms principals Larry Baum and Jordan Kavana executed and delivered an Exceptions to Non-recourse Guarantee in favor of Independence Bank on or about the date of the Note (the "Marina Palms Guarantee Agreement").

7. The Marina Palms Note, Marina Palms Security Instrument, Marina Palms Guarantee Agreement, and all other documents evidencing, guaranteeing, securing or relating to the Marina Palms Loan (collectively, the "Marina Palms Loan Documents") have all been duly assigned, endorsed and/or delivered by Sovereign to the Trust.

8. Marina Palms took out a mezzanine loan in the amount of $3,000,000 (the "Marina Palms Mezzanine Loan"), which was made on or about the same date as the Marina Palms Loan.

9. Marina Palms failed to pay its September 1, 2008 payment and all subsequent payments, thereby causing certain defaults and Events of Default (as defined in the Marina Palms Security Instrument).

10. Due to the Marina Palms Mezzanine Loan, the true LTV ratio at origination was 93%, which was too risky given this type of loan. The true DSCR was correspondingly made riskier as well.

11. Sovereign underwrote the Marina Palms Loan based on an alleged arms' length transaction with $1,500,000 increase in price and value in eight months without supporting documentation of the significant increase in value and without verifying that the transaction, in fact, was arms' length and not just a transaction to enable a cash out refinance, contrary to Sovereign's underwriting.

12. During the origination of the Marina Palms Loan, Sovereign reported NCF DSCR as 1.23 based on an EGI of $2,668,689 (95% occupancy) and expenses of $1,048,737 (resulting in NOI of $1,619,952 and NCF of $1,542,872).

13. In contrast to what was reported during origination, actual Mortgaged Property operations for the year ended December 31, 2007 (a year after loan origination and including a half year before the securitization Closing Date) showed average occupancy for the full year of 71%, EGI of $2,325,498, NOI of $1,135,701, NCF of $1,075,901, with a resulting NCF DSCR of 1.03.

14. Under Section 11(a) of the Marina Palms Security Instrument, the Borrower shall not "allow changes in the use for which all or any part of the Mortgaged Property is being used at the time this Instrument was executed …",

15. Further, under Section 17(a)(1) of the Marina Palms Security Instrument, the Borrower shall not "permit impairment" of the Mortgaged Property.

16. The precipitous decline in occupancy from 95% to 70% following closing of the loan in a market reporting 96% occupancy in comparable properties is an indication of either a change in use, an attempted condominium conversion, or an otherwise impairment of the property, all constituting a default under the Mortgage.

17. The Pledge and Security Agreement for the Marina Palms Mezzanine Loan, by which the equity interest of Marina Palms was pledged to Banif U.S. Real Estate Fund, a Cayman Islands company, provided for full recourse to Marina Palms under specified "bad boy" acts, similar to the "bad boy" recourse under the Marina Palms Note and Marina Palms Security Instrument.

18. Despite the high leverage of the combined Marina Palms Loan and the Marina Palms Mezzanine Loan, the Marina Palms Note provided for borrower payments of interest only for the first 36 months.

19. The November 20, 2006 approval letter for the Marina Palms Loan reported an approved principal amount of $16,500,000. There is a handwritten, initialed modification on the approval letter increasing the loan amount to $17,400,000. No documentation is in the file regarding the request for and approval of this $900,000 increase. The actual principal amount at closing was $17,480,000.

20. The Marina Palms Mezzanine Loan had a balloon date of December 12, 2009, only three years after the simultaneous closing of the Marina Palms Loan and the Marina Palms Mezzanine Loan.

21. Exhibit B to the Marina Palms Security Instrument removed the requirement of Section 7 requiring monthly escrow of sewer and water, taxes and insurance premiums.

22. Exhibit C to the Marina Palms Security Instrument required Marina Palms to deposit all rents into an account "established, owned, and controlled by Lender …." There is no evidence such an account was established, which was a breach/default under the Marina Palms Security Instrument. Further, if such an account was established, Sovereign did not transfer that account and required cash management and security agreement to the Trust upon securitization.

## SOVEREIGN'S BREACHES OF REPRESENTATION AND WARRANTY 10

Pursuant to Paragraph 10 of Exhibit B to the MLPA, "[t]he origination, servicing and collection practices used by Seller … with respect to such Mortgage Loan have been in all material respects legal, proper and prudent and have met customary industry standards."

Sovereign breached Representation and Warranty 10 with respect to each of the Loans in multiple respects because its origination and servicing of the Loans, as detailed above, was not proper and prudent, nor did it meet customary industry standards. Not only were the Mortgaged Properties for four of the Loans encumbered by undisclosed second loans[2], but each of the Loans also suffered from a host of other origination and servicing flaws, some of which were systemic in nature.

## SOVEREIGN'S BREACHES OF REPRESENTATION AND WARRANTY 7

Pursuant to Paragraph 7 of Exhibit B to the MLPA, "[t]here exists no material default, breach, violation or event of acceleration (and, to Seller's knowledge, no event that, with the passage of time or the giving of notice, or both, would constitute any of the foregoing) under the documents evidencing or securing the Mortgage Loan, in any such case to the extent the same materially and

---

[2]     This specific breach of Representation and Warranty 10 as to the Linden Loan, the Grand Loan and the Caroline Arms Loan was asserted in the original notice of Breach as to those loans.

adversely affects the value of the Mortgage Loan and the related Mortgaged Property; provided, however, that this representation and warranty does not address or otherwise cover any default, breach, violation or event of acceleration that specifically pertains to any matter otherwise covered by any other representation and warranty made by Seller."

Sovereign breached Representation and Warranty 7 with respect to the Caroline Arms Loan, the Grand Loan, and the Marina Palms Loan because the borrowers for each Loan were in material default and/or breach under the documents evidencing or securing the Loans as of the Closing Date for the reasons described above.

## MATERIAL AND ADVERSE EFFECT OF THE BREACHES

The Breaches of Representation and Warranties 10 and 7 had a material and adverse effect on the value of the Loans, the value of the related Mortgaged Properties, or the interest of the Certificateholders, including but not limited to diminishing the value of the Loans to the Certificateholders.

## DEMAND FOR PURCHASE PRICE PURSUANT TO PSA AND MLPA

Pursuant to Section 2.03(b) of the PSA, Waterstone on behalf of the Special Servicer for 2007-C1 gives supplemental notice of Breach of Representations and Warranties 10 and 7 related to the Loans, each of which caused the requisite material and adverse effect. Waterstone hereby demands that Sovereign, within the Initial Cure Period, pay the Purchase Price for the Loans in conformity with the PSA and MLPA. Based upon the specific Breaches that are asserted herein, cure is not possible.

Waterstone has serviced the Loans in an attempt to limit the adverse effects of defaults under the loan documents. For itself and on behalf of the parties listed on the attached Schedule A, Waterstone reserves any and all rights or remedies it may come to be able to assert under the PSA, MLPA, or other documents governing the Trust.

August 20, 2014
Page 10 of 12

Sincerely,

WELLS FARGO BANK, N.A., as Trustee for the registered holders of Sovereign Commercial Mortgage Securities Trust, 2007-C1, Commercial Mortgage Pass-Through Certificates, Series 2007-C1

By:    Waterstone Asset Management, LLC, solely in its capacity as Sub-Special Servicer

By: _____

Name:    John M. Church
Title:    Chief Executive Officer

Enclosures

## SCHEDULE A

**Depositor:**

Morgan Stanley Capital I Inc.
1585 Broadway
New York, New York 10036
Attention: Warren Friend and Brian Landau

**Master Servicer:**

Berkadia Commercial Mortgage LLC
118 Welsh Road
Horsham, PA 19044

**Special Servicer:**

Berkadia Commercial Mortgage LLC
700 North Pearl St., Suite 2200
Dallas, TX 75201

**Mortgage Loan Seller:**

Sovereign Bank
1500 Market Street
Centre Square –Concourse
Philadelphia, PA 19102
Attention: Director of Securitization

**With a copy to:**

Sovereign Bank
75 State Street
Boston, MA 02109
Attention: General Counsel

Santander Bank, N.A.
824 North Market Street, Suite 100
Wilmington, DE 19801

**Trustee/Paying Agent:**

Wells Fargo Bank, N.A.
9062 Old Annapolis Road
Columbia, Maryland 21045
Attention: Corporate Trust Services (CMBS)
Sovereign Commercial Mortgage Securities
Trust 2007-C1

**Custodian:**

Wells Fargo Bank, N.A.
1055 10th Avenue SE
Minneapolis, MN 55414

**Controlling Class Representative:**

Waterstone Capital Advisors, LLC
8720 Red Oak Blvd., Suite 300
Charlotte, NC 28217

A1

**SCHEDULE B**

1. Loan Number 577208165 ("Enco Loan")
   Prospectus Number: 226
   Property Address: 1720 East Tiffany Drive

2. Loan Number:  574000450 ("Linden Loan")
   Prospectus Number:  69
   Property Address:  1975 Linden Blvd.

3. Loan Number:  577206256 ("Grand Loan")
   Prospectus Number:  252
   Property Address:  69-53/57 Grand Ave.

4. Loan Number:  577204970 ("Caroline Arms Loan")
   Prospectus Number:  60
   Property Address:  6457 Fort Caroline Rd.

5. Loan Number:  577208838 ("Marina Palms Loan")
   Prospectus Number:  4
   Property Address:  The Marina Palms Apartments